# EXHIBIT 6

## MANAGEMENT AGREEMENT

### (Prague Community Hospital )

This MANAGEMENT AGREEMENT ("Agreement") is by and among HEALTH ACQUISITION COMPANY, LLC a West Virginia Limited Liability Company, ("HAC") and CAH Acquisition Company 7, LLC d/b/a Prague Community Hospital, a Delaware limited liability company ("CAH7") and EMPOWERHMS, LLC, a West Virginia limited liability company ("Manager"). HAC and CAH7 are referred to individually as "HAC Party" and collectively as "HAC Parties". HAC Parties and Manager are referred to individually as a "Party" and collectively as the "Parties."

### PREMISES

A.      HAC, own through a consolidated group of wholly-owned subsidiaries ten (10) acute care hospitals and associated clinics located in rural communities, all of which are certified by CMS as Critical Access Hospitals and some of the clinics are certified by CMS as Rural Health Clinics.

B.      CAH7 is a subsidiary of HMC/HAC and the owner of Prague Community Hospital  and its associated clinics located (collectively, the "Hospital").

C.      HAC and RCHA is currently operating and managing the hospitals and clinics owned by its subsidiaries as an operationally unified and financial integrated healthcare system (the "Hospital System").

D.      RCHA and CAH7 have decided to discontinue management of the Hospital and to contract with Manager to manage the day-to-day operations of the Hospital and certain operations of HAC. HAC and its other subsidiaries have made the same decision for the other hospitals and clinics. In making their decision, HAC Parties acknowledge that Manger intends to provide management and consulting services, or to own and operate other hospitals that are not a part of the Hospital System. EmpowerHMS will indemnify, to the fullest extent, RCHA and all staff, owners and members, of RCHA for any and all actions taken by EmpowerHMS staff after April 1st, 2017. RCHA will indemnify, to the fullest extent, EmpowerHMS staff, owners and members from any and all action taken by or on behalf of RCHA prior to April 1st, 2017.

### AGREEMENT

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions contained herein and other good and valuable consideration, the receipt and adequacy of which are hereby forever confessed, the Parties agree as follows:

## SECTION 1

## TERMS GENERALLY: DEFINITIONS

**1.1**  **Terms Generally.** As used in this Agreement, (a) the word "or" is not exclusive, (b) the words "consent" and "approval" are synonymous and, except as otherwise specified herein, are deemed to be followed by the phrase "which shall not be unreasonably withheld or delayed," (c) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (d) any pronoun shall include the corresponding masculine, feminine and neuter forms, (e) words in the singular number include words in the ' plural and vice versa unless the context of the usage of such term clearly indicates otherwise, (f) accounting terms that are used, but not otherwise defined herein, are to be construed and interpreted in accordance with "generally accepted accounting principles" and procedures (GAAP) in effect on the Commencement Date, and (g) the phrase "made available to a Party" shall mean made available to such Party via email, facsimile or other electronic transfer or through other written means for purposes of this Agreement.

**1.1**  **Jointly Drafted.** The Parties have been advised by experienced counsel, and have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted in its entirety by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

**1.2**  **Definitions.** For purposes of this Agreement, the following words and phrases shall have the following respective interpretations and meanings:

**"Additional Payments"** means payments made by HAC Parties to Manager for Additional Services. The Parties acknowledge and agree that the Additional Payments shall be (i) negotiated in good faith by the Parties based upon market rates for activities of similar scope and complexity in the marketplace and (ii) contingent upon the successfully originating and closing the transaction upon which the Additional Payments are based.

**"Additional Services"** means (i) any services performed by Manager in connection with a Capital Project or (ii) any other ad hoc advisory or consulting services or activities that are not included in, or related to, the Services. By way of illustration and not limitation, Additional Services would include activities related to equity or debt financings and/or re-financings for the Hospital whether in connection with a Capital Project or otherwise, or the sale of the Hospital or purchase of an additional hospital facility from a third-party. Additional Services would not include the start up work related to the opening of a new clinic or other line of clinical services for the Hospital or the performance of any other operational services (whether or not such services are included in the Services) that are currently performed by an HACParty's in-house personnel to the Hospital.

**"Affiliate"** means any corporation, partnership, joint venture or other entity controlled by, controlling or under common control with, directly or indirectly, any of the Parties or any one of such entities.

**"Applicable Laws"** means any federal, State, or local statute, law, municipal charter provision, regulation, ordinance, rule, mandate, judgment, order, decree, permit, code or license requirement or other governmental requirement or restriction, including Conditions of Participation, or any interpretation or administration of any of the foregoing by any governmental authority, which applies to the obligations of any Party under this Agreement, whether now or hereafter in effect.

**"Approved Budget"** shall have the meaning set forth in Section 4.03(b).

**"Authorized Representative"** means the natural persons and any successors designated by Manager and HAC Parties pursuant to Section 11,05 to represent such Parties, and to act on the behalf of such Parties, under this Agreement. Any and all references to the taking of any action, or the giving of any consent, by a Party under this Agreement shall be deemed to include the taking of such action, or the giving of such consent, by the Party's Authorized Representative

**"Billing Month"** means each accounting month of Manager. For each quarter of the Billing Year, there will be a 4/4/5 week cycle of three (3) consecutive Billing Months. The first Billing Month shall begin on the Commencement Date. The first Billing Month of each Billing Year shall begin on October 1st and the last Billing Month of each Billing Year shall end on September 30th, except that the last Billing Month shall end concurrently with the expiration of this Agreement or, as applicable, the date of termination of this Agreement.

**"Billing Year"** means a Fiscal Year comprising twelve (12) Billing Months, except that (i) the first Billing Year shall commence on the Commencement Date and end on September 30th immediately following the Commencement Date and (ii) the last Billing Year shall end concurrently with the end of the term or, as applicable, the date of termination, of this Agreement.

**"Board"** means, as applicable, the Board of Directors of HMC/HAC or the Board of Managers of CAH7.

**"Capital Project"** means (i) a project for the modification, alteration, addition to, and or improvement to the existing facilities or equipment of the Hospital having a project cost in excess of $1,000,000, or (ii) a project for the replacement (including the acquisition of the replacement site) of the existing Hospital facilities with new facilities. For the avoidance of doubt, the Parties acknowledge and agree that (x) installation of electronic medical records (EMR) by the Hospital System and (y) the replacement of the existing CPSI financial system for the Hospital System by NexGen Software Group are not Capital Projects.

**"Cash"** means currency and coins on hand, bank balances, and negotiable money orders and checks.

**"Change In Control"** shall mean:

    a.  The acquisition by any Person of beneficial ownership or more of the combined voting power of the then outstanding voting securities of a Person entitled to vote generally in the election of directors or managers ("Outstanding Voting Securities"): or

    b.  The approval by the shareholders or members of a Person of a reorganization, merger or consolidation, unless following such reorganization, merger or consolidation:

          1.  more than 51% of the combined voting power of the then outstanding voting securities of such reorganized, merged or consolidated Person entitled to vote generally in the election of directors or managers is then beneficially owned directly

or indirectly, by all or substantially all of the same Persons who were the beneficial owners of the Outstanding Voting Securities immediately prior to such reorganization, merger or consolidation in substantially the same proportions as their ownership, immediately prior to such reorganization, merger or consolidation, of the Outstanding Voting Securities; and

2.  at least a majority of the members of the board of directors or managers of the Person resulting from such reorganization, merger or consolidation were members of the incumbent board of directors or managers at the time of the execution of the initial agreement providing for such reorganization, merger or consolidation; or

3.  at least a majority of the members of the board of directors or manager of such Person were members of the incumbent board of directors or managers at the time of the execution of the initial agreement or action of the board providing for such sale or other disposition of assets.

**"Change in Law"** means the enactment, adoption, promulgation, modification, repeal or change after the Commencement Date of any Applicable Law that (i) necessitates or makes advisable a Capital Project, (ii) increases the Service Fee by establishing requirements with respect to the operation or maintenance of the Hospital, or (iii) otherwise impacts a Party's ability to perform its obligations under this Agreement. For purposes of this definition, no enactment, adoption, promulgation or modification of an Applicable Law shall be considered a Change in Law if, as of the Commencement Date, such Applicable Law would have directly affected the continued operation, maintenance, repair or management of the Hospital by HAC Parties after the Commencement Date in the absence of this Agreement and either (i) such Applicable Law was officially proposed by the responsible agency and thereafter had become effective without further action, or (ii) the adoption, enactment or promulgation process by the appropriate federal, State or local body commenced before the Commencement Date, and with respect to which, (1) the comment period expired on or before the Commencement Date, (2) any required hearings concluded on or before the Commencement Date in accordance with applicable administrative procedures, and (3) it thereafter became effective without further action. The definition of "Change in Law" shall include changes in reimbursement rules and regulations or Conditions of Participation applicable to the Hospital under the Critical Access Hospital program.

**"CMS"** means The Centers for Medicare and Medicaid Services within the United States Department of Health and Human Services (DHHS).

**"Conditions of Participation"** means the conditions that a hospital must meet to be designated as a Critical Access Hospital, as set forth in 42 C.F.R. Subpart F, Title 42: Public Health, Part 485—Conditions of Participation: Critical Access Hospitals.

**"Commencement Date"** means the date this Agreement is executed, the commencement of the provision of Services by Manager hereunder, and the date upon which the Term begins; provided, however, there shall be no Commencement Date unless and until all of the conditions set forth in Section 2 are satisfied or waived.

**"CPI"** means the United States Department of Labor's Bureau of Statistics' Consumer Price Index, All Items Index TABLE 1, for all urban consumers; U.S. City average for the applicable 12-month period. The current internet address for the CPI is ftp://ftp.bls.gov/pub/special.reauests/cDi/cDiai.txt.

**"Documents"** means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Hospital or the Hospital System in each case whether or not in electronic form.

**"Final Confirmation Order"** means the Order entered by the United States Bankruptcy Court for the Western District of Missouri on December 12, 2012 confirming HAC Parties' Plan of Reorganization, which, pursuant the Federal Rules of Bankruptcy Procedure (Fed. R. Bankr. P. 8002(a)) became final fourteen (14) days later for purposes of appeal on December 26, 2012.

**"Fiscal Year"** means the twelve (12) months beginning on October 1st of each year and ending on September 30th of each year.

**"Force Majeure"** means any act, event or condition that has a direct material adverse effect on the performance of Manager's obligations, or on the performance of a subcontractor or supplier of its obligations to Manager, if such act, event or condition is beyond the reasonable control of Manager, subcontractor or supplier asserting a Force Majeure as justification for not performing its obligations; provided such act, event or condition cannot be caused by the negligent or intentional action of Manager, or subcontractor or supplier.

**"Hospital Expense"** means:

    a.  Any costs and expenses of operation and maintenance of the Hospital, including heat, water, electricity and all other utilities, insurance premiums, licenses, supplies, permits and inspection fees, costs of labor, services and materials incurred under contracts for the Hospital, and services provided by third-parties for legal services, accounting and audit services, and architectural services, feasibility studies, certificate of need applications and similar items related to a Capital Project; and

    b.  Any other liabilities and obligations incurred in connection with the Hospital including all payment obligations and other obligations and liabilities arising under contracts for the Hospital with materialmen, mechanics or other parties whose charges can become liens against the Hospital's assets and facilities.

It is acknowledged and agreed by the Parties that Hospital Expenses shall not include those costs and expenses and liabilities and obligations that are incurred and paid by Manager in the performance of Services under the terms of this Agreement.

**"Hospital Personnel"** means those employees of HAC Parties who are charged with carrying out the day-to-day work and duties of the Hospital, including physicians, nurses and other healthcare professionals, managerial and administrative personnel, housekeeping and janitorial workers.

**"Incentive Fee"** has the meaning ascribed in Section 5.03.

**"Insolvency"** means the occurrence of any of the following:

a.  Inability, failure, or refusal to pay debts as they mature, entry into an arrangement by any Party with or for the benefit of their creditors, or any Party's consent to or acquiescence in the appointment of a receiver, trustee, or liquidator for a substantial part of such Party's property; or

b.  A bankruptcy, winding up, reorganization, insolvency, arrangement, or similar proceeding instituted by or against any Party under the laws of any jurisdiction, which proceeding is not dismissed within sixty (60) days; or

c.  Any action or answer in a bankruptcy, winding up, reorganization, insolvency, arrangement, or similar proceeding in which any Party approves of, consents to, or acquiesces in, any such proceeding; or

d.  The levy of any distress, execution, or attachment upon the property of any Party which shall substantially interfere with its performance under this Agreement; provided that with respect to any Party, this form of insolvency shall not be deemed to have occurred if the insolvency is caused primarily by another Party's failure to make a payment due pursuant to this Agreement within forty- five (45) days of when it becomes due and payable.

**"Management Fee"** has the meaning ascribed in Section 5.02.

**"Medical Staff"** means the organized body of licensed physicians and other healthcare professionals, who are permitted by law to be members of the Medical Staff and who are approved and given privileges to provide health care to patients in the Hospital. Medical staff personnel may work full time or part time and may be employed by the Hospital or may be independent contractors or individuals employed by third-parties who are granted clinical privileges to practice.

**"Patient Records"** means any Documents containing information concerning medical, health care or behavioral health services provided to, or the medical, health care or behavioral health of any individual, or that are otherwise subject to regulation under Applicable Laws, including the Health Insurance Portability and Accountability Act of 1996 (" HIPAA "), the Health Information Technology for Economic and Clinical Health Act (" HI TECH Act " ) and all regulations promulgated pursuant thereto, including the Transaction Code Set Standards, the Privacy Rules and the Security Rules set forth at 45 C.F.R. Parts 160 and 164.

**"Person"** means any natural person or any entity including a corporation, limited liability company, limited partnership, partnership, joint venture, association, joint-stock trust, unincorporated organization, or government, agency or authority (including federal, State, county, municipal or other local agency) or political subdivision thereof.

**"Policies and Procedures"** means any and all of the policies, procedures and directives in effect for the Hospital and, as applicable, the Hospital System on the Commencement Date, as the same may be amended and supplemented from time-to-time thereafter by HAC Parties after consultation with Manager.

**"Program Payors"** means any governmental or non-governmental reimbursement program charged with paying claims for hospital or professional services rendered by the Hospitals to patients, including

(i) any reimbursement under Medicare, Medicaid, and all other similar Federal, state or local reimbursement programs and (ii) any private insurance or other non-governmental reimbursement programs.

**"Services"** means the managerial and other services provided by Manager for the Hospital and HAC Parties in accordance with this Agreement. For the avoidance of doubt, the Parties intend that, except for Additional Services, the Services shall be the same as those services are currently being provided to the Hospital as a constituent member of the Hospital System by the HAC Parties.

**"Service Fee"** means the fee comprising the Management Fee and Incentive

**"State"** means the State in which the Hospital is located.

**"Term"** means the term of this Agreement comprising the Initial Term and, as applicable, the First Renewal Term, the Second Renewal Term, and the Third Renewal Term as set forth in Section 9.01.

**"Uncontrollable Circumstance"** means any act, event or condition that prevents any Party from meeting, or materially increases the cost of performing, its obligations under this Agreement, if (i) such act, event or condition is beyond the reasonable control of the Party asserting an Uncontrollable Circumstance as justification for not meeting or performing such obligations, and (ii), with respect to Manager's obligations, such act, event or condition is not the result of Manager's failure to operate and maintain the Hospital in accordance with the terms and conditions of this Agreement. Subject to the immediately preceding provisions of this definition, the following acts, events or conditions may qualify as an Uncontrollable Circumstance:

a. Flood, hurricane, tornado, epidemic, severe earthquake, catastrophic fire or explosion, act of a public enemy, war, blockade, insurrection, riot, general unrest, restraint of government and people, civil disturbance, sabotage or similar occurrence;

b. The order, injunction or judgment of any federal, State or local court, administrative agency or governmental body or officer with jurisdiction over the Parties, including any exercise of the power of eminent domain, police power, condemnation or other taking by or on behalf of any public, quasi-public or private entity; provided that such order, injunction or judgment did not arise in connection with or is not related to the negligent or wrongful action or inaction of the Party relying thereon and provided further that neither the contesting in good faith of any such order, injunction, or judgment nor the reasonable failure to so contest shall constitute or be construed as a wrongful or negligent action or inaction of such Party;

c. The suspension, termination, interruption, denial, failure to issue, modification or failure of renewal of any permit, license, consent, authorization or approval necessary to the operation, maintenance, repair and management of the Hospital; provided that such act or event did not arise in connection with, or is not related to, the negligent or willful action or inaction of the Party asserting an Uncontrollable Circumstance and provided further that neither the contesting in good faith of any such order nor the reasonable failure to so contest shall be construed as a negligent or willful action or inaction of such Party;

d. Change in Law;

e. The loss or inability to obtain any and all utility services, including electric power, necessary for the operation, maintenance, repair and management of the Hospital directly resulting in

a partial or total curtailment of operations at the Hospital for reasons other than the negligent, willful or wrongful action or inaction of Manager;

f.   The failure of any subcontractor or supplier, other than a Party, to furnish services, materials, inventory or equipment on the dates agreed to; provided (1) such failure is the result of a Force Majeure, (2) such failure materially and adversely affects Manager's ability to perform its obligations and (3) Manager is not reasonably able to obtain substitute services, material, inventory or equipment on the agreed upon dates.

g.   An Uncontrollable Circumstance shall not include (i) any act, event or condition which is caused by the negligence or intentional action of the Party asserting the Uncontrollable Circumstance, its subcontractors, agents and employees, (ii) any event, reasonably foreseeable on the Commencement Date; (ii) economic infeasibility; (iii) any labor strike, work stoppage or slowdown on the part of Manager's employees, and (iv) subject to the definition of a Change in Law regarding changes in reimbursements rules and regulations or Conditions of Participation, any order, injunction or judgment of any federal, State or local court, administrative agency or governmental body interpreting federal, State, or local tax Laws.

## SECTION 2

### CONDITIONS PRECEDENT TO PARTIES' OBLIGATIONS

**2.1    Satisfaction of Conditions.** All rights and obligations of the Parties under this

Agreement shall be subject to the satisfaction of the following conditions precedent:

a.   HAC Parties shall have delivered to Manager (i) a certificate of its Authorized Representative, dated as of the Commencement Date, to the effect that each of the representations of HAC Parties set forth in Section 10.01 of this Agreement is true and correct in all material respects as if made on such date and (ii) an opinion of counsel to HAC Parties, in customary form and reasonably acceptable to Manager, to the effect set forth in Sections 10.01 (a), (b), (c) and (d);

b.   Manager shall have delivered to HAC Parties (i) a certificate of its Authorized Representative, dated as of the Commencement Date, to the effect that each of the representations of Manager set forth in Section 10,02 of this Agreement is true and correct in all material respects as if made on such date and (ii) an opinion of counsel to Manager, in customary form and reasonably acceptable to HAC Parties, to the effect set forth in Sections 10.02 (a), (b). (c) and £d).

c.   HAC Parties shall have received an independent broker's letter which certifies that all policies of insurance required to be obtained by Manager pursuant to this Agreement have been obtained;

d.   Manager shall have received an independent broker's letter which certifies that all policies of insurance required to be obtained by HAC Parties pursuant to this Agreement have been obtained;

    e.   No action, suit, proceeding or official investigation shall have been overtly threatened or publicly announced or commenced by any Person in any federal, State or local court that (i) seeks to enjoin, assess civil or criminal penalties against, assess civil damages against or obtain any judgment, order or consent decree with respect to any Party as a result of the Parties' negotiation, execution, delivery or performance of this Agreement, or (ii) may, in the reasonable opinion of any Party, materially impair any other Party's ability to satisfactorily perform its obligations hereunder;

    f.   No change shall have occurred on or before the Commencement Date in any Applicable Laws that would make the execution or delivery by any Party of this Agreement or that would make compliance by any Party with the terms and conditions of this Agreement, a violation of Applicable Laws;

    g.   All of the documents, approvals or authorizations listed in this Section 2.1 shall be in full force and effect on the Commencement Date; and

    h.   Contemporaneously with the execution of this Agreement, Manager shall enter into management agreements with HACand each of the other Hospitals.

**2.2**    **Satisfaction of Conditions.** The Parties shall exercise good faith and due diligence in satisfying the conditions precedent identified in Section 2.01. Such conditions shall be satisfied or waived on or before the Commencement Date or no Party shall be liable to any other Party under this Agreement. In such case, each Party shall bear its respective costs and expenses attributable to the negotiation of the transactions herein contemplated.

## SECTION 3

### OBLIGATIONS AND RELATIONSHIP OF PARTIES

**3.1**    **Independent Contractor.**

    a.   Nothing in this Agreement shall be deemed to constitute any Party a partner, employee or legal representative of any other Party. The Parties agree that Manager has entered into and shall be performing its obligations under this Agreement as an independent contractor.

    b.   As an independent contractor, Manager has the sole right and responsibility to control and direct the means, manner and method by which its duties and obligations under this Agreement are performed and satisfied, including the right to enter into subcontracts with Affiliates or third-party vendors for the provisions of the Services pursuant to this Agreement. In the event Manager enters into a subcontract to provide Services with a value of $10,000 or more, the subcontractor shall be required to provide access to its books, documents and records in accordance with this Agreement and Applicable Law. For the avoidance of doubt, any cost and expense associated with a subcontract shall not be a Hospital Expense.

    c.   To the extent permitted pursuant to this Agreement and Applicable Law, Manager may, from time to time, act as the agent of HAC Parties, and in so acting, shall possess the apparent and actual authority to act or speak for HAC Parties in accordance with this Agreement and

Applicable Law; provided that Manager shall not by words, acts or representations convey to the general public, any Person or any governmental unit the impression that Manager has any other authority or power, and the Parties shall take any action necessary to correct any such erroneous inferences and to prevent reliance on such a mistake of fact.

**3.2**   **Not Related Parties.** Manager and HAC Parties are not (and shall not become) related parties to one another and do not have (and shall not have) overlapping members on their respective governing bodies. In addition, neither of the Parties has (and shall not have) any voting power or control over another Party's governing body or officers, directors, managers, shareholders and members.

**3.3**   **Medical Judgments.** By entering into this Agreement, HAC Parties do not delegate to Manager any matters requiring professional medical judgments, and all such matters shall be the responsibility of the Medical Staff or other health professionals. Manager shall not be responsible for, nor have any right to make, judgments regarding the delivery of medical care by physicians or other health professionals.

**3.4**   **Governance.**

   a. During the Term, HACshall maintain in office one or more executive officers who are authorized by, and accountable to, the Board of Directors for (i) the day-to-day management of those portions of HMC's business that are not delegated to Manager under this Agreement, (ii) the supervision of the performance and implementation of HAC Parties' duties and responsibilities under this Agreement, and (iii) the performance all other customary duties and responsibilities of executive officers under Delaware law.
   b. HAC Parties shall retain all authority vested exclusively in them by Applicable Laws and accreditation standards, and Manager shall undertake only such activities under this Agreement as are permitted by Applicable Law and accreditation standards. The Boards of HAC Parties shall represent the Hospital in matters pertaining to the interpretation of this Agreement; provided that in any situation in which the Boards of HAC Parties shall be required or permitted to take any action or to give any approval, Manager may rely upon the written statement of the Authorized Representative of HAC Parties to the effect that any such action or approval has been taken or given. Whenever any action shall be subject to the approval of the Boards of HAC Parties, to the extent possible, Manager shall be entitled to receive a decision within five (5) business days or such shorter period as necessary to ensure compliance with Applicable Laws after notification of the proposed action shall have been made available to the Authorized Representative of HAC Parties.
   c. Each Party shall invite the other Parties' Authorized Representative(s) to attend all meetings of such Party's Board, and the committees thereof, in a non-voting observer capacity and, shall make available to the Authorized Representative copies of all notices, minutes, consents and other Board or committee materials that it provides to its directors, managers or committee members; provided that in no event shall the failure to provide the notice described above invalidate in any way any action taken at a meeting of the Board of a Party or any committees thereof. Each Party reserves the right to withhold any information and to exclude another Party's Authorized Representative from any meeting, or any portion thereof, as is reasonably

determined by the Party to be necessary for purposes of confidentiality, competitive factors, attorney-client privilege or other reasonable purposes. For the avoidance of doubt, the Parties acknowledge and agree that they are not fiduciaries to one another and that any participation by a Party in the other Party's Board meetings shall only be advisory in nature and shall not deemed to be an exercise of any control over the decisions made by the applicable Board.

**3.5     Payment of Hospital Expenses.** HAC Parties shall pay, make funds available to Manager for the payment of, or otherwise cause to be satisfied or discharged, all Hospital Expenses when due under their terms (and prior to the implementation of any penalties); provided that either HAC Parties, in their own name, or Manager, in the name and behalf of HAC Parties, may contest in good faith the payment of any Hospital Expenses. In the event of any such contest, any such Hospital Expense may remain unpaid during the period of the contest and any appeal therefrom. The Parties will cooperate fully with one another in any such contest or appeal. The costs incurred by the Parties in any such contest or appeal shall be a Hospital Expense. Any material increase in Manager's cost to perform the Services resulting from a Change in Law shall be subject to HAC Parties Board approval.

**3.6     No Financing Transactions.** Except as otherwise permitted by this Agreement, Manager shall not engage in any financing transactions that result in liens, mortgages, lines of credit or security interests in the name of the Hospital or HAC Parties without the advance written consent of HAC Parties, which may be withheld in HAC Parties' sole discretion. Prior to requesting consent for approval, Manager shall provide a term sheet to HAC Parties describing the amount of required financing, the purpose of the financing, a rate-of-return analysis forecasting sufficient revenue to repay the financing, and other reasonable financing alternatives, if any. Manager shall not, under any circumstance, pledge the credit of HAC Parties or the revenues of the Hospital, nor shall Manager in the name of or on behalf of HAC Parties borrow any money or execute any promissory note other obligation, or dispose of any asset of the Hospital other than in the ordinary course of business, without the prior written consent of HAC Parties.

**3.7     Limitations on Dividends and Other Distributions.** During the Term, except as otherwise provided for in the Final Confirmation Order, HAC Parties shall not pay any dividends or make any other distributions to its shareholders and/or members incident to their ownership of shares of stock and/or membership interests in HAC Parties unless HAC Parties are current on all payments of the Service Fee to Manager in accordance with this Agreement, and notwithstanding that HAC Parties are current on all payments of the Service Fee to Manager in accordance with this Agreement, if the making of any such payment will render the HAC Parties unable to make any payment of the Service Fee in accordance with this Agreement when the same becomes due.

## SECTION 4

### PROVISION OF SERVICES

**4.1**    **Overall Responsibilities of Manager.** On and after the Commencement Date and through the Term, Manager shall, in accordance with this Agreement, Applicable Laws and applicable industry standards shall, on a exclusive basis, provide or arrange for the provisions of the following Services:

a.  Professional, reliable and cost effective management and supervision of the Hospital that is, to the extent practicable, consistent with the Hospital's participation in the Hospital System;

b.  Human resources services to Hospital Personnel;

c.  General accounting functions for the Hospital, billing, collection, reimbursement and revenue cycle functions for the Hospital including acting on HAC Parties' behalf with respect to contracting with Program Payors, and accounts payable functions with respect to Hospital operations including the payment of the Service Fee, any Additional Payments, or other payments due to Manager in accordance with this Agreement;

d.  Maintenance and retention of all Patient Records and other records of the Hospital;

e.  Maintenance, generation, filing and provision to the appropriate Persons in a timely manner all information, notices, reports and records, as may be required of the Hospital pursuant to Applicable Laws, as expeditiously as possible after the requisite information is made available to Manager but in no event later than the applicable date specified in this Agreement or that which may be reasonably required under the circumstances to make appropriate filings or to give appropriate notices in a timely manner;

f.  Evaluation of proposed, pending or final regulatory changes from an operational standpoint to determine their effect on the Hospital's operations and the Policies and Procedures;

g.  Assistance to HAC Parties in responding to requests for information from external financial auditors and others, including federal, State and local audits and information requests, permit compliance reports, information requests from users or groups of users of the Hospital, and information requests from communities that are provided healthcare services by the Hospital;

h.  Maintenance and support of professional and responsive working relationships with the Authorized Representative of HAC Parties and the Medical Staff, local, State and federal regulatory authorities, suppliers of materials, the media and the public, and the local community and advisory board of the Hospital;

i.  Advice and assistance to HAC Parties in instituting legal action or proceeding reasonably necessary for the operation of the Hospital, or in defending any legal action or proceeding brought against HAC Parties or the Hospital, except legal actions between the Parties;

j.  Maintenance and updating of the Policies and Procedures on an as- needed basis and as required by Applicable Laws;

k.  Advice and assistance to HAC Parties in the preparation of monthly unaudited and annual audited financial statements of the Hospital to HAC Parties;

l.  Support to HAC Parties in connection with its long-term and short-term planning and implementation of Capital Projects and any Additional Services related thereto; and

m.  Provide to HAC Parties unlimited access to the Hospital and its facilities and to Patient Records and other records of the Hospital and/or the Hospital System. It is acknowledged and agreed by the Parties that all such records shall be and remain the property of HAC Parties.

**4.2    Overall Responsibilities of HAC Parties.** On and after the Commencement Date and during the Term, HAC Parties shall, in accordance with this Agreement and Applicable Laws:

a.  Pay, or cause to be paid, the Service Fee, any Additional Payments or other payments due to Manager in accordance with the terms of this Agreement;

b.  Pay, make funds available to Manager for the payment of, or otherwise cause to be satisfied or discharged, all Hospital Expenses in accordance with the terms of this Agreement;

c.  Retain oversight and responsibility for policy guidance of the Hospital;

d.  Employ and provide all Hospital Personnel (other than the CEO) needed to staff the Hospital at a level sufficient to ensure the safe and efficient operations;

e.  Implement, or cause to be implemented, such Capital Projects relative to the Hospital as HAC Parties, in their sole discretion, deem necessary or appropriate;

f.  Provide Manager with unlimited access to the Hospital and its facilities and to Patient Records and other records of the Hospital and/or the Hospital System as may be necessary or convenient to permit Manager to perform its obligations under this Agreement; provided, however, it is acknowledged and agreed by the Parties that all such records shall be and remain the property of HAC Parties;

g.  Maintain and keep, with the cooperation and assistance of Manager, in force all applicable federal, State and local certifications, regulatory, licenses and permit requirements and any subsequent modifications with respect to the Hospital;

h.  Pay all taxes assessed and due with respect to the Hospital;

i.  Make available to Manager, warranty information, engineering drawings, calculations, maintenance manuals, operational records, logs, reports, relating to the design, condition, operation or maintenance of the Hospital; and

j.  Assist Manager with the purchase of, and pay for, all equipment and inventory and other tangible personal property to be used in the operation, maintenance, and capital improvements to the Hospital.

**4.3    Strategic Planning and Budgeting.**

a.  Prior to the preparation of the annual budget, Manager shall prepare and submit to HAC Parties for their review and approval, the strategic plan containing recommendations for the Hospital's short and medium-range goals and objectives. By way of illustration, such plan may include recommendations concerning the type and scope of services provided at the Hospital, the means by which such services are provided, and proposed modifications to the Hospital's facilities and equipment. It is acknowledged and agreed by the Parties that, to the extent practicable, the strategic plan for the Hospital shall be consistent with the strategic plans for the Hospital System.

b.  At least forty-five (45) days before the end of each Fiscal Year, Manager shall prepare and submit to HAC Parties for their review and approval, a proposed annual operating budget, annual capital expenditures budget, and annual cash flow projections of the Hospital for the next Fiscal Year. Manager shall, on an on-going basis, suggest appropriate revisions to the budget to reflect material changes during the course of each Fiscal Year. Once HAC Parties have approved an annual budget and any appropriate revisions thereto ("Approved Budget").

Manager shall be authorized to proceed with expenditures contemplated by the Approved Budget without the need for further approval by HAC Parties.

**4.4    Management Reports and Meetings.** No less frequently than once each Billing Quarter during the Fiscal Year, Manager shall meet with the Authorized Representative of HAC Parties to discuss and review the status of the Hospital's operations. Manager shall prepare and circulate an agenda at least three (3) business days prior to such meeting and, within fifteen (15) days following the meeting, a summary report detailing the matters discussed and agreed upon follow-up action. No later than ninety (90) days following the end of each Billing Year, Manager shall submit to the Authorized Representative of HAC Parties a detailed and comprehensive report addressing the operational status of the Hospital during such Billing Year.

**4.5    Authority to Purchase and Contract: Limitations.**

a.  To the extent contemplated by the Approved Budget, Manager shall have the responsibility and authority to (i) enter into, perform, and carry out on behalf of and in the name of HAC Parties, any and all accounts, contracts, leases, agreements or other documents that are, in the reasonable business judgment of Manager, necessary or desirable to facilitate the efficient delivery of the Services and (ii) amend, extend, modify, or terminate any such account contract, lease, agreement, and other documents. To the extent possible, all agreements entered into by Manager pursuant to this Agreement shall be freely assignable to either or both of HAC Parties. Any purchase or contract by Manager made pursuant or otherwise ancillary to this Agreement shall be a Hospital Expense.

b.  Manager shall have the responsibility and authority to contract with such special consultants as Manager, from time-to-time, deems desirable. Each such contract shall be on behalf of, in the name of and at the expense of HAC Parties, and shall be subject to the prior written approval of HAC Parties only if the contract amount is not included in the Approved Budget and will result in a Hospital Expense greater than $250,000 for each individual unbudgeted item or in the aggregate for all unbudgeted items in any Fiscal Year. Consultants shall be deemed to be retained as independent contractors by HAC Parties.

c.  HAC Parties agree that Manager, or an Affiliate of Manager, may be chosen as a vendor, lessee or contracting party for any purpose contemplated by this Agreement; provided that any product or service purchased or leased from Manager, or an Affiliate of Manager, must be (i) granted on a competitive basis or (ii) priced at market rates and approved in advance by HAC Parties if the contract amount is not included in the Approved Budget and will result in a Hospital Expense greater than $250,000 for each individual unbudgeted item or in the aggregate for all unbudgeted items in any Fiscal Year.

d.  Manager shall not have the authority to enter into, perform, and carry out any account, contract, lease, agreement or other document if the amount thereof (i) is not included in the Approved Budget and will result in a Hospital Expense greater than  $1,000,000 for each individual unbudgeted item or in the aggregate for all unbudgeted items in any Fiscal Year, or (ii) is for the lease or purchase capital assets that are not a part of the current Approved Budget, without the prior written approval of HAC Parties.

e.  Nothing in this Agreement shall authorize Manager, without the prior written consent of HAC Parties (which may be withheld in HAC Parties' sole discretion but shall be deemed granted by inclusion of an item in the Approved Budget), to enter into any contract, commitment or transaction not in the usual and ordinary course of the business of the Hospital, utilize the assets of the Hospital for any purpose other than the continued operation of the Hospital, distribute any of the assets of the Hospital to Manager or any other person or entity, or dispose of, transfer, convey, pledge, mortgage, encumber or otherwise subject to any lien or security interest any of the assets of the Hospital.

f.  The Parties acknowledge and agree that Manager is not a merchant and accordingly, MAKES NO WARRANTY, EXPRESSED OR IMPLIED INCLUDING, WITHOUT LIMITATION, THAT OF FITNESS FOR A PARTICULAR PURPOSE OR MERCHANTABILITY IN RESPECT OF THE SUPPLIES, EQUIPMENT AND OTHER GOODS AND SERVICES PURCHASED ON BEHALF OF THE HOSPITAL OR HAC PARTIES. The terms used in this Section 4.05(f) are defined in each particular instance by the Uniform Commercial Code as enacted in the State in which the Hospital is located.

**4.6    Accountants; Financial Statements.**

a.  Manager shall provide assistance to HAC Parties in (i) retaining a firm of independent certified public accountants ("CPA") approved by HAC Parties, (ii) assembling the information required to prepare HAC Parties' Fiscal Year financial audit for the Hospital and the Hospital System, and (iii) responding to the management representation letter regarding any findings or any recommendations made by the CPA.

b.  In consultation with the CPA, Manager shall establish and administer accounting procedures and controls and systems for the development, preparation and safekeeping of records, assets, and books of account relating to the business and financial affairs of the Hospital in its role as a constituent member of the Hospital System.

c.  In consultation with the CPA and within the guidelines of generally accepted accounting principles ("GAAP" ). Manager shall make decisions as to accounting principles and elections, whether for book or tax purposes; provided that Manager shall not, without the prior written consent of HAC Parties, which may be withheld in HAC Parties' sole discretion, change the nature of the business of the Hospital as currently conducted, or change the accounting methods or practices with respect to the Hospital.

d.  HAC Parties shall have the right at all reasonable times during the usual business hours of Hospital and upon demand to audit, examine, and make copies of books of account and similar records maintained by Manager applicable to the Hospital or the Hospital System.

e.  At all times, Manager shall keep HAC Parties informed of the financial condition and operation of the Hospital and provide such reports in such form and with such content as HAC Parties may reasonably request, including the following reports to be prepared in consultation with the CPA and delivered to HAC Parties:

1.  Within forty-five (45) days after the close of each month, the unaudited and consolidated financial statements of the Hospital and the Hospital System for the preceding month and the Fiscal Year to date; and

2.  Within one-hundred twenty (120) days following the last day of each Fiscal Year, the audited and consolidated financial statements of the Hospital and Hospital System for the Fiscal Year ended.

**4.7     General Accounting and Revenue Cycle Functions.**

a.  Manager shall use the information technology systems being utilized by the Hospital and the Hospital System on the Commencement Date, or such other systems that the Parties by mutual agreement may designate from time-to-time during the Term. Manager shall use its best efforts to ensure that all such systems operate in a manner consistent with all Applicable Laws and any third-party payor requirements. It is acknowledged and agreed by the Parties that HAC Parties have entered into binding commitments to replace the existing information technology systems with the NEXTGEN Healthcare systems,

b.  Manager shall manage the complete revenue cycle of the Hospital  including registration of patients, preparation and delivery of patient bills, generation and delivery of past due patient bills, receipt of revenues and deposits; debt collection, responding to and processing patient inquiries and requests, correction of billing errors, disbursement or application of revenues and deposits, informing patients of their rights and responsibilities, adding and deleting accounts, recordkeeping, database maintenance, and all other financial services, using the Policies and Procedures in effect for the Hospital and the Hospital System on the Commencement Date.

c.  Manager shall provide the Hospital with CMS and other third-party payor reimbursement services including arranging on behalf of HAC Parties for the preparation and filing of cost reports, coordinating the fiscal intermediary audits of such cost reports, assisting with the appeal of audit adjustments by fiscal intermediaries to such cost reports, maintaining and updating the accounting system including accounting entries to record cost reports, monitoring and implementing legislative and regulatory changes to third-party reimbursement, and monitoring third-party payor cash flow.

d.  Manager shall manage the accounts receivable of the Hospital, including government patient receivables and other patient and third-party payor receivables, and cost report settlements arising from Hospital's rendering of services to patients, billed and unbilled, recorded or unrecorded, accrued and existing, using the Policies and Procedures in effect for the Hospital and the Hospital System on the Commencement Date. Manager shall use its best efforts to ensure that all funds are collected and expended for the payment of and on behalf of the Hospital, and shall notify HAC Parties promptly if insufficient funds exist or funding is projected to be insufficient.

e.  Manager shall make, or direct to be made, timely deposits of all receipts and moneys arising from the operation of the Hospital in accordance with the Policies and Procedures in effect for the Hospital and the Hospital System on the Commencement Date. Deposits shall be made in such interest bearing or non-interest bearing accounts (including lock box accounts) as may be designated by HAC Parties, from-time-to time, in such banks, savings and loan associations, and other financial institutions as HAC Parties may from time-to-time select. Consistent with the operations of the Hospital System as an operationally unified and financially consolidated business, the funds of the Hospital may be comingled with the funds of the other hospitals and clinics in the Hospital System. The funds of the Hospital may not be comingled with the funds of Manager.

f.  Manager shall exercise reasonable care in applying the Hospital's collections to the timely payment of Hospital Expenses. Manager may make disbursements from such accounts on behalf of HAC Parties in such amounts and at such times as the same are required to operate the Hospital and the Hospital System in accordance with the Approved Budget and Policies and

Procedures in effect from time-to-time. Manager shall establish the signatories and approvals as to the amounts on all checks subject to the review and approval of HAC Parties.

**4.8    Continuation of Benefits Program; Human Resources Functions.**

a.  The Parties acknowledge and agree that, to the extent practicable, the employee benefit program in effect for the Hospital System on the Commencement Date (the "Benefits Program") shall be continued under this Agreement with such endorsements, amendments and supplements as necessary to reflect the requirements of this Agreement.

b.  Manager shall supervise and direct the day-to-day work activities of Hospital Personnel and shall determine the qualifications and the number (FTEs) of Hospital Personnel required for the safe and efficient operation of the Hospital and shall establish and revise wage scales, employee benefit packages, in-service training programs, staffing schedules, and job descriptions for Hospital Personnel.

c.  Manager shall have the authority: (i) to negotiate, execute and terminate employment contracts with physicians and other healthcare professionals, and (ii) to hire, discipline and terminate Hospital Personnel. The termination of employment agreements and Hospital Personnel must be approved in writing in advance by HAC Parties' Authorized Representative; provided that in emergent circumstances, Manager shall have the authority to termination any employment agreement and Hospital Personnel as Manager deems necessary or prudent for the safe and efficient operation of the Hospital, and all such emergent terminations shall be final and not subject to the review and approval of HAC Parties.

d.  Manager shall, at its own cost and expense, provide the Hospital with the services of a hospital administrator, who shall serve as the chief executive officer ("CEO") of the Hospital. Manager shall employ the CEO and shall pay his salary and benefits. Hospital Personnel shall be under the direct supervision and control of the CEO, and the CEO shall be under the direct supervision and control of Manager.

e.  To the extent permitted by law, prior to employing any newly hired Hospital Personnel, Manager must request and obtain from such employee detailed information concerning such employee's qualifications and ability to perform the position for which such employee is applying. Manager shall provide newly hired Hospital Personnel with an orientation and shall conduct interviews, employee performance assessments, and initial ninety (90)-day performance reviews.

f.  Manager shall provide training for all Hospital Personnel involved in providing the Services. Manager shall ensure that all training of Hospital Personnel is continually updated on a scheduled basis, and that all Hospital Personnel shall be recertified or relicensed, as applicable, as required or as recommended pursuant to Applicable Laws. It is the sole responsibility of Manager to ensure that all Hospital Personnel are fully knowledgeable of his or her duties and responsibilities. HAC Parties reserve the right to inspect, review and monitor any and all training conducted by Manager. This includes inspection and review of all training materials, interviews with all training personnel, and monitoring of all training classes. Each individual employee's training needs will be assessed against qualifications and experience required for each job description. Job skills enhancement training shall be provided by Manager at all levels. The training shall continue throughout the Term.

g.  Manager shall not unlawfully discriminate against any worker, employee or applicant, or any member of the public and shall comply with federal, State or local law. Manager shall take affirmative steps to ensure that applicants are considered for employment, and that Hospital Personnel are dealt with during employment, without regard to their race, color, religion, gender, national origin, age, disabled veteran or Vietnam-era veteran status. Such affirmative steps shall apply to, but not be limited to, the following: hiring, promotion, demotion or transfer; recruitment or recruitment advertising; layoff or termination, or rates of pay or other forms of compensation; and selection for training, including apprenticeship.

**4.9     Safety of Persons and Property.**  On and after the Commencement Date and through the Term, Manager shall comply with all Applicable Laws that relate to the safety of Persons or property with respect to the Hospital and their/its protection from damage, injury or loss, and shall designate a qualified and responsible representative of Manager whose duties shall include safety and the prevention of medical errors, fires and accidents and to coordinate such activities as shall be necessary with federal, State, and other local officials.

**4.10     Medical Staff and Professional Matters.** The Medical Staff shall be organized and function according to the Hospital's Medical Staff bylaws, as amended from time-to-time, subject to review and approval of HAC Parties. Manager shall assist HAC Parties with respect to development and maintenance of Medical Staff relations and coordinating the duties of the Medical Staff. Manager shall oversee the Medical Staff's administrative affairs, including monitoring the performance of professional services by the Medical Staff and other healthcare professionals to ensure that the Hospital maintains high standards of patient care, treatment and related functions. Manager shall also assist and direct the Hospital and the Medical Staff in updating and revising its Medical Staff bylaws, and in the privileging and credentialing process. The foregoing notwithstanding, HAC Parties retain control and authority over all appointments to the Medical Staff, the granting of clinical privileges at the Hospital, and any actions taken with respect to Medical Staff members, including appeals of adverse actions in accordance with the Medical Staff bylaws. HAC Parties may at any time revoke Manager's authority to oversee Medical Staff affairs, appointments, and actions at the Hospital.

**4.11     Physician Recruitment.** Manager shall use its best efforts to recruit, as-needed, additional physicians to become members of the Medical Staff. Recruited physicians shall meet such criteria as established by Manager, in consultation with HAC Parties and the Medical Staff. Any cost incurred in the recruitment of such physicians relating to income guarantees, moving expenses, travel expense or other similar type expenses shall be incurred in accordance with the Approved Budget and shall be a Hospital Expense.

**4.12     Quality Assurance.** Legal Compliance and Risk Management. Manager shall continue, and carry out the day-to-day implementation of, the quality assurance and quality control, legal compliance and risk management programs, and the Policies and Procedures related thereto, in effect for the Hospital System on the date of this Agreement, as the same may be amended and supplemented from time-to-time with the consent of HAC Parties.

**4.13    Compliance with Applicable Laws and Policies and Procedures; Emergent Circumstances.**

a.  Manager shall operate the Hospital in compliance with Applicable Laws and using the Policies and Procedures in effect for the Hospital and the Hospital System on the Commencement Date. Any material deviation from the Policies and Procedures must be approved in writing in advance by HAC Parties; provided that in emergent circumstances, Manager shall have the authority to establish such Policies and Procedures as Manager deems necessary or prudent for the operation of the Hospital. All such emergent Policies and Procedures shall remain subject to the final review and approval of HAC Parties.

b.  If Manager demonstrates its compliance with this Agreement, Manager shall not be liable for payment for any fines or civil penalties imposed by any federal, State or local court or governmental regulatory and permitting agencies having competent jurisdiction. If however the imposition of such fines and penalties is due to (i) Manager's negligent act or omission, (ii) its willful or wrongful action or inaction, or (iii) its failure to meet or demonstrate its compliance with the requirements of this Agreement, Manager shall be solely liable for the payment of any such fine, civil penalty or damage as a consequence of action or failure.

c.  If Manager shall become aware of any event, activity, problem or circumstance relative to the operation of the Hospital that threatens or may threaten the public health, safety or welfare of the patients or employees of the Hospital, Manager shall immediately take all necessary and appropriate actions to correct and mitigate such situation and make such notifications as required by the circumstances and/or by Applicable Laws. Manager shall immediately notify HAC Parties. If prior authorization from HAC Parties cannot be obtained in a timely manner under the circumstances, Manager shall make such necessary and reasonable expenditures to comply with its obligations under this Agreement. All such expenditures shall be reimbursed to Manager as a Hospital Expense.

**4.14    Inspections.** HAC Parties shall through their representatives and agents, with the full cooperation of Manager, without prior written or oral notice, and on a twenty-four (24) hour per day, seven (7) days per week basis, have full access to and the unlimited right to inspect the Hospital to determine whether Manager is in compliance with all of its obligations under this Agreement. All expenditures incurred by HAC Parties related to such inspections shall be a Hospital Expense.

**4.15    Maintenance.** During the Term, Manager shall perform, or arrange for the performance of, all corrective, predictive, preventive, periodic and routine maintenance or repair of the Hospital and equipment. Such maintenance and repair shall not be less frequent and comprehensive than that recommended or specified in manufacturer s warranties. Manager shall cooperate and assist HAC Parties to enforce equipment warranties. All expenditures incurred by Manager with respect to such maintenance and repair and warranties enforcement, shall be a Hospital Expense.

**4.16    Capital Projects.**

a.  The Parties recognize and agree that they must coordinate their activities related to Capital Projects such that the activities can be accomplished in an efficient and timely manner while permitting Manager the ability to comply with its duties and obligations under this Agreement. In order to ensure such coordination, Manager shall have the exclusive right, and the obligation, to provide to HAC Parties the work and activities related to the implementation all Capital Projects and any other Additional Services related thereto.

b.  Within ninety (90) before the end of each Billing Year, the Parties shall develop a plan for Capital Projects for the next Fiscal Year and estimate of the costs associated therewith. HAC Parties shall determine which Capital Projects shall be done, and when those Capital Projects shall be implemented. If HAC Parties implement a Capital Project, the Parties shall implement the Capital Project upon mutually agreeable terms, and HAC Parties shall provide Additional Payments to Manager for the Capital Project and any other Additional Services related thereto.

c.  All Capital Projects shall become and remain the property of HAC Parties beginning with the earlier of the date they are procured, implemented or installed. Manager hereby covenants and warrants that Manager shall not have any lien, security or other ownership interest in the Hospital, a Capital Project, or any part thereof, and hereby waives, now and forever, any lien, security or other ownership interest it may or could otherwise have or allege to have under any Applicable Laws, to any part of the Hospital or Capital Projects.

**4.17    Management of Additional Hospitals and Clinics.** Manager shall have the exclusive right, and the obligation, to provide Services, under and pursuant to the terms and conditions of this Agreement, to any additional hospitals and clinics that are purchased or otherwise acquired by HAC Parties in transaction involving a Change or Control or otherwise.

**4.18    Evaluation of Full Staffing Model.** After the Commencement Date, the Parties shall undertake to evaluate the feasibility of Manager employing the Hospital Personnel instead of CAH7. If the Parties agree to proceed, this Agreement shall be modified or amended accordingly including, among other things, an increase in the Service Fee by an amount equal to the aggregate costs to Manager to provide the services that the former Hospital Personnel will provide as employees of Manager plus a reasonable profit margin. For the avoidance of doubt, the final decision regarding whether Manager will employ Hospital Personnel shall, at all times, remain in the sole discretion of the Parties.

### SECTION 5

### SERVICE FEE

**5.1    Service Fee.** The Service Fee shall be the sum of the Management Fee and the Incentive Fee.

**5.2 Management Fee Payment: Adjustments.**

a.  For any Billing Year, the Management Fee shall be the greater of (i) $619,000 (the "Minimum Management Fee" 1. or (ii) an amount equal to ten (10%) percent of the Cash collected during the Billing Year, as the same is shown in the Fiscal Year financial audit of the Hospital and the Hospital System for the Billing Year.

b.  For each Billing Month during any Billing Year, HAC Parties shall pay to Manager an amount equal to one-twelfth (1/10th) of the Minimum Management Fee. The Minimum Management Fee shall be billed on the first (1st) day of each Billing Month and shall be paid by the fifteenth (15th) day of the same Billing Month.

c.  If the Audited Financial Statements for any Billing Year show that the Management Fee for the Billing Year is greater than the Minimum Management Fee paid to Manager, HAC Parties shall pay such greater amount to Manager within thirty (30) days after the delivery of the Audited Financial Statements to HAC Parties.

d.  The Management Fee shall be adjusted annually (up or down) commencing with the second Billing Year, by an amount equal to the product of the Management Fee for the current Billing

Year times the annual change in the CPI; provided that in no event shall any downward CPI adjustment reduce the Management Fee below the Minimum Management Fee.

**5.3 Incentive Fee; Calculation and Payment.**

    a.    For any Billing Year, the Incentive Fee shall be equal to an amount not to exceed Twenty-five (25%) of the Minimum Management Fee for such Billing Year (the "Maximum Incentive Fee"). For each Billing Year, the Incentive Fee shall be calculated based on the mutual assessment of the performance of Manager with respect to incentive criteria with associated:

        1.    The quality improvement measures set forth on Exhibit 5.03. all of which measures have been mutually agreed to by the Parties as of the Commencement Date and

        2.    The financial performance measures to be agreed upon by the Parties in good faith within one hundred eighty (180) days after the Commencement Date.

The Parties further acknowledge and agree that (x) the quality improvement measures set forth on Exhibit 5.03 shall act as the threshold requirement or trigger for the calculation of the Incentive Fee based upon the financial performance measures; (y) the financial performance measures shall be divided into various subcomponents that will be assigned weighted percentages and (z) HAC Parties shall pay Manager the Incentive Fee based upon the total SIGNATURE PAGE TO MANAGEMENT

(The rest of this page is intentional left blank)

AGREEMENT FOR PRAGUE COMMUNITY HOSPITAL   COMMUNITY HOSPITAL

In Witness Whereof, the Parties hereto have caused this Agreement to be executed by

their duly authorized officers as of        /        / 2017

HAC PARTIES:

Health Acquisition Company

By: Name: Title:

ATTESTED BY:

Name:

_____

Title:

_____

MANAGER:

EMPOWERHMS:

By: Jorge Perez

Title: CEO

Exhibit 5.03

**QUALITY IMPROVEMENT MEASURES OF INCENTIVE FEE**

The following quality improvement measures are mutually agreed to by the Parties as of the Commencement Date. Such measures shall act as a trigger for the calculation of the Incentive Fee based upon the financial performance measures to be agreed upon by the Parties within 180 days after the Commencement Date.

**Introduction**

The Parties agree that they we must predicate the right of the Manger to receive an Incentive Fee based upon the improvement of the clinical performance of the Hospital. The logical way in which to do this is to incorporate a component of the Centers for Medicare and Medicaid Services (CMS) Core Measures as specifically applied to critical access hospitals. A Core Measure is one that utilizes the results of evidence based medicine research. This principle implies that it is reasonable to expect that every patient with a given diagnosis will receive the baseline or core care that has been established through such research.

Core Measures represent high volume, high cost diagnoses associated with an increased rate of morbidity as determined by CMS. This program, now known as the Hospital Inpatient Quality Reporting Program (IQR), which now includes over thirty measures, is intended to accomplish the following: Improve patient care; Assure the local community that the hospital is providing high quality care Inform the public and Provide management/governance with the means by which the clinical performance can be measured.

In accordance with the importance of the above, the Parties believe that the attainment of an acceptable performance rating as measured against the national and state Core Measures benchmarks should be the threshold requirement or trigger for even being considered for incentive compensation based on the provision of management services and financial performance. Only after successfully meeting the Core Measures component of the incentive program would the Manager be considered eligible for incentive compensation, based on the more traditional measures of financial performance.

**Approach**

The current Core Measures for critical access hospitals include inpatient process of care measures that reflect recommended treatments for:

Acute myocardial infarctions ("AMI");

Heart failure;

Pneumonia;

Surgical care improvement.

In accordance with the above, the Parties agree that the Hospitals be measured against the average for all reporting hospitals in the United State and the state in which the facility is located in the following manner:

1. Treatment for AMI Measures:

Average number of minutes before outpatients with chest pain, possible heart attack or a need for specialized care were appropriately transferred to another hospital;

Number/percentage of heart attack patients given aspirin at discharge; Average number of minutes before outpatients experiencing chest pain or a possible heart attack received an EKG;

The number/percentage of outpatients experiencing chest pain or possible heart attack who received drugs within thirty (30) minutes of arrival to break up possible blood clots; Outpatients experiencing chest pain or possible heart attack who received aspirin within twenty-four (24) hours of arrival; and Heart attack patients given fibrinolytic medication within thirty (30) minute of arrival.

2. Heart Failure Measures:

Number/percentage of patients presenting with heart failure given discharge Instructions Number/percentage of patients presenting with heart failure given an evaluation of Left Ventricular Systolic ("LVS") function; and Number/percentage of patients presenting with heart failure given ACE inhibitor or ARB for Left Ventricular Systolic Dysfunction ("LVSD").

3. Pneumonia Measures:

Number/percentage of patients presenting with pneumonia whose initial blood culture was performed prior to the administration of the first hospital dose of antibiotics; and Number/percentage of patients presenting with pneumonia who were given the most appropriate initial antibiotic(s).

4. Surgical Care Improvement Processes Measures:

Assuring that all applicable patients receive the /recommended prescribed antibiotics at the correct time prior to surgery; Assuring that the administration of prescribed antibiotics that are administered in conjunction with surgical procedures is stopped at the correct time after completion of the surgery; Maintaining surgical patients' temperature and blood glucose (sugar levels at normal levels; Removing patient catheters in a timely manner after surgery that are used to drain the patient's bladder during the surgical procedure; For cardiac patients, assuring that certain prescription drugs, including drugs used to control heart rhythms and blood pressure, are continuously administered during the period immediately before, during and after surgery; and Administering drugs that prevent blood clots and using other methods such as special stockings in order to increase circulation in the legs.

**Accreditation Standards**

Critical access hospitals are required to collect data internally on a minimum of four Core Measure sets or a combination of Core Measure sets and other quality measures that are generally referred to as 'non-core' measures although they are not required, at this time, to report this data to accrediting organizations. Although the foregoing list of Core Measures is not exhaustive, their collective importance to maintaining a high level of quality is obvious and it is therefore the Parties agree that they be used. Other Core Measures may become available at which time the Parties may agree to add to or replace those set forth above.

**Statistical Relevance**

Although the Core Measures previously discussed address conditions commonly treated by rural and critical access hospitals, such hospitals, in many instances, simply do not treat a sufficient number of patients in a particular category to meaningfully calculate and assess performance on a quarterly basis (e.g. CMS requires that there be a minimum of twenty-five (25) qualifying cases before reporting). However, the underlying assumption is that as a particular data base is expanded to a full four quarters of data for each measure, the number of cases will increase, thereby increasing the reliability and consistency of the results.

**Additional Quality Measures**

In addition to the Core Measures, additional consideration should be given to patient satisfaction, regulatory compliance issues (e.g. compliance with EMTALA requirements, compliance with annual OIG Work Plan requirements and annual compliance education).