**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE CITY OF PRAGUE, OKLAHOMA and PRAGUE PUBLIC WORKS AUTHORITY,
Plaintiffs,

vs.

CAH ACQUISITION COMPANY 7, LLC; HMC/CAH CONSOLIDATED, INC.; RURAL COMMUNITY HOSPITALS OF AMERICA, LLC; EMPOWER H.M.S.; JORGE A. PEREZ; WCS CORPORATION, INC., successor-by-merger to CPP WOUND CARE #24; LINCOLN COUNTY TREASURER AND BOARD OF COUNTY COMMISSIONERS; and JOHN DOES 1-10,
Defendants.

Case No. 19-CIV-89-G

**NOTICE OF CIVIL CONTEMPT DAMAGES, WITH BRIEF IN SUPPORT**
**[Related to Doc. 52]**

This action involves a tug-of-war over the Prague Community Hospital (the "Hospital"). On one side are the Plaintiffs, who have desperately sought to keep the Hospital open to serve the community. On the other, are a number of Defendants who wholly abandoned the Hospital, its employees, its patients, and the community.

On March 8, 2019, this Court issued its *Order* finding CAH Acquisition Company 7, LLC, Empower H.M.S., and Jorge A. Perez (collectively the "Contempt Defendants") in civil contempt [Doc. # 52] (the "Contempt Order"). The Order directed Plaintiffs to submit proof of their damages for injuries resulting from these Defendants' noncompliance with the Court's temporary restraining orders. Plaintiffs submit this *Notice of Civil Contempt Damages, with Brief in Support* in response to the Order.

## BRIEF IN SUPPORT

### I. PROCEDURAL HISTORY

1. Plaintiffs originally filed the above-captioned lawsuit (the "Lawsuit") on January 15, 2019, in the District Court of Lincoln County, State of Oklahoma.

2. On January 16, 2019, the Plaintiffs obtained a temporary restraining order from the District Court of Lincoln County, Oklahoma ("State Court TRO") [Doc. # 1-12].

3. On January 31, 2019, the Contempt Defendants, and others, filed a Notice of Removal [Doc # 1], which removed the Lawsuit to this Court.

4. Plaintiffs then sought an expedited hearing on their requests for a receiver and request for a temporary injunction. See, Doc. # 14, # 15.

5. A hearing on these issues was scheduled for February 8, 2019 [Doc. # 17].

6. On February 5, 2019, the Contempt Defendants and others filed a motion to move the February 8, 2019 hearings [Doc. # 19], to which Plaintiffs objected [Doc. # 20].

7. In response, the Court entered an Order setting a telephone conference for February 6 at 4:00 p.m. The Court Order that the parties determine "what if any safeguards are available if the hearing is moved to a later date." [Doc. # 21].

8. The Court heard from the parties on the conference call regarding the status of the Hospital and the safeguards needed to protect it until the hearings could be held. To implement those safeguards, on February 7, 2019, the Court issued a temporary restraining order ("TRO") and continued the hearings to February 19, 2019 [Doc. # 24].

9. On February 14, 2019, the Plaintiffs filed their *Motion for Civil Contempt, with Brief in Support* [Doc. # 31] contending that Hospital Defendants violated the State Court TRO and this Court's TRO by: (a) failing to provide daily written reports and (b) shifting management to iHealthcare, Inc. and failing to inform this Court of such.

10. At the continued hearing on February 19, 2019, prior to the Court holding the hearing, the parties deliberated at length trying to resolving the case. One concession discussed was an agreed extension of the TRO.

11. At the hearing, the parties announced that they needed more time to try and resolve the matters, and that they had agreed to extend and modify the TRO. Thus, on February 19, 2019 the Court entered an *Order* extending and modifying the TRO (the "Extended TRO") [Doc. # 40].

12. On February 26, 2019, the Plaintiffs filed the *Supplement to Plaintiffs' Motion for Civil Contempt* [Doc. # 41] contending that the Hospital Defendants violated the State Court TRO, the Initial TRO, and the Extended TRO by: (a) suspending the hospital's chief executive officer; (b) failing to provide daily written reports; (c) failing to provide access to US Bank account; and (d) failing to pay employees wages, vendors, and further operate in the normal course of business.

13. On February 27, 2019, the Court held a telephone conference on the status of the parties' efforts to resolve the Lawsuit. Plaintiffs' counsel orally moved for a temporary receiver due to a "disruption that has taken place in the operation of the [Hospital…]" which was confirmed by the Hospital Defendants on the call. [Doc. # 43].

14. On March 4, 2019, the Hospital Defendants responded to the Motion for Civil Contempt and the Supplement to Plaintiffs' Motion for Civil Contempt [Doc. # 46].

15. Also on March 4, 2019, the Court entered an Order temporarily appointing Cohesive Healthcare Management + Consulting, LLC ("Cohesive") as receiver over CAH Acquisition Company 7, LLC. [Doc. # 47]

16. On March 5, 2019, the Court held a hearing on various issues, including Plaintiffs' Motion for Contempt and Supplement thereto (the "Contempt Hearing").

17. At the Contempt Hearing's conclusion, the Court entered the Contempt Order, which instructed Plaintiffs to:

> …submit proof of its damages for injuries resulting from these Defendants' noncompliance with the Court's order. Plaintiffs' request should include only those damages claimed to be the result of the relevant Defendants' acts of noncompliance with the Initial and Extended TROs, as found in this Order, and those attorney's fees and costs specifically related to seeking enforcement of the TROs through civil contempt proceedings." Contempt Order at 10. [Doc. # 52].

18. Thus, the Plaintiffs request damages, costs and fees as outlined below, without prejudice to seeking other and/or further damages as appropriate.

## II. STANDARD OF REVIEW FOR CIVIL CONTEMPT DAMAGES

The purpose of civil contempt damages is twofold: "(1) to coerce compliance with the court's order; and (2) to compensate the injured party for losses or damages resulting from noncompliance." *Baker Hughes, Inc. v. Summit ESP, LLC*, 2018 WL 468285, at *4 (N.D. Okla. Jan. 18, 2018) (citing *F.T.C. v. Kuykendall*, 371 F.3d 745, 764–65 (10th Cir. 2004); *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442 (10th Cir. 1998)).

The sanctions imposed are to be remedial or coercive, but not penal, and are to be adapted to the particular circumstances of each case." *NLRB v. Monfort, Inc.*, 29 F.3d 525, 528 (10th Cir.1994). In awarding litigation costs, the Tenth Circuit has indicated:

> In ordering the award of attorneys' fees for compensatory purposes in this (civil contempt) case, the court is merely seeking to insure that its original order is followed. Otherwise, the benefits afforded by that order might be diminished by the attorneys' fees necessarily expended in bringing an action to enforce that order violated by the disobedient parties.

*Allied Materials Corp. v. Superior Products Co., Inc.*, 620 F.2d 224 (10th Cir. 1980) (quoting *Cook v. Ochsner Found. Hosp.*, 559 F.2d 270, 272 (5th Cir. 1977). Finally, civil contempt damages need only be proven by a preponderance of the evidence. *See Reliance Ins. Co. v. Mast Const. Co.*, 159 F.3d 1311, 1318 (10th Cir. 1998).

## III. ARGUMENTS AND AUTHORITIES

There are two types of civil contempt sanctions: coercive and compensatory. "Sanctions for civil contempt may only be employed for either or both of [those] two distinct remedial purposes." *O'Connor v. Midwest Pipe Fabricators, Inc.,* 972 F.2d 1204, 1211 (10th Cir. 1992). Coercive contempt sanctions "look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order." *Latrobe Steel Co. v. United Steelworkers,* 545 F.2d 1336, 1344 (3rd Cir.1976). Compensatory sanctions, however, seek to "compensate the complainant through the payment of money for damages caused by past acts of disobedience." *Id.; see also Maggio v. Zeitz,* 333 U.S. 56, 67–68 (1948); *United States v. United Mine Workers of Amer.,* 330 U.S. 258, 303–04 (1947). Here, Plaintiffs seek both.

**PROPOSITION I: PLAINTIFFS ARE ENTITLED TO COERCIVE DAMAGES**

Courts should design coercive sanctions be to bring about the desired result and to reflect the character and magnitude of harm if the desired result is not achieved. *O'Connor,* 972 F.2d at 1211; *see also United Mine Workers,* 330 U.S. at 304. Contempt sanctions are civil and coercive rather than punitive where the contemnor is given the opportunity to purge the contempt by complying with the underlying order. *Int'l Union, United Mine Workers of Amer. v. Bagwell,* 512 U.S. 821, 828 (1994). Providing an option to purge means that the contemnor "carries the keys of his prison in his own pocket," meaning he can end the penalty at any time by complying with the order. *Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 442 (1911) (quoting *In Re Nevitt,* 117 F. 448, 461 (8th Cir.1902)).

In the instant case, this Court's TRO and the Extended TRO ordered the Contempt Defendants to operate the Hospital in the normal course of business. But, rather than running the Hospital, the Court found that the Contempt Defendants abandoned it:

> [N]o matter what the parties had in mind when they proposed to the Court that Hospital Defendants continue to operate the Hospital "in the normal course of business," Initial TRO at 2; Extended TRO at 1, **no reasonable definition of the phrase extends to the operators of a functioning hospital essentially abandoning the facility, ceasing all contact with the facility's employees, and leaving its staff and patients to fend for themselves**.

Contempt Order at 8 (emphasis added).

The Contempt Defendants' refusal to operate the Hospital was detrimental to the health, safety, and wellbeing of the community of Prague. Due to the character and

magnitude of the Contempt Defendants' behavior – the intentional failure to maintain the Hospital as a *functioning hospital* – coercive sanctions are appropriate. Plaintiffs request that the Contempt Defendant be ordered to purge themselves of their willful failure to operate the Hospital by remitting the funds outlined below.

**A. Reasonable and Necessary Costs of Operating the Hospital in the normal course of business.**

The Court orally approved the Receiver on March 4, 2019, and entered a written Order memorializing that approval on March 8, 2019 [Doc. # 51]. On March 15, 2019, the Receiver filed its *Motion of Receiver to Advance Operating Funds* [Doc. # 55], and later its *Supplement to Motion of Receiver to Advance Operating Funds* [Doc. # 63]. By these pleadings the Receiver sought approval for payment of the costs and expenses that the Contempt Defendants *should* have been paying to operate the Hospital.

On April 11, 2019, the Court conducted an evidentiary hearing on the Receiver's Motions where it heard testimony and considered two Exhibits offered by the Receiver. Hearing Exhibit 1 outlined the expenses the Receiver advanced to operate the Hospital between March 4, 2019 and April 8, 2019 in the amount of $218,771.00. A true and correct copy of Hearing Exhibit 1 is attached hereto as **Exhibit 1**.

At the conclusion of the April 11 Hearing, the Court entered an Order [Doc. # 70] declaring that "[t]he advances by Cohesive of the sum of $218,771.00 through the date of the hearing, as outlined in Exhibit 1 introduced into evidence, are hereby approved as reasonable and necessary costs of the Receivership Estate…" Because the Contempt

Defendants would have spent $218,771.00 had they properly operated the Hospital, Plaintiffs are entitled to coercive damages against them in the amount of $218,771.00.

**B. Damages Related to Diagnostic Laboratory of Oklahoma.**

On March 1, 2019, the City of Prague was required to pay $5,000.00 directly to Diagnostic Laboratory of Oklahoma, LLC ("DLO"). (City Affidavit, **Exhibit 2**, ¶¶ 8-10) As set forth in Plaintiffs' Supplement to Motion for Contempt, DLO threated to discontinue providing lab services due to Contempt Defendants' non-payment. This payment was necessary solely because the Contempt Defendants violated the TRO and the Extended TRO. A copy of the Purchase Order and City check paying DLO is attached as **Exhibit 3**. (City Affidavit, **Exhibit 2**, ¶ 10)

**PROPOSITION II: PLAINTIFFS ARE ENTITLED TO COMPENSATORY DAMAGES**

Where a sanction is compensatory, the amount of the fine must be based on actual losses incurred as a result of noncompliance with an order. *O'Connor,* 972 F.2d at 1211. "Actual losses" can include attorney's fees incurred in preparing a motion for contempt. *Kaufman v. Am. Family Mut. Ins. Co.*, 601 F.3d 1088, 1091 (10th Cir. 2010) (affirming district court's sanction ordering attorney to pay fees incurred by opposing party in preparing motion for sanctions premised upon attorney's violation of protective order).

**A. Damages Related to Diagnostic Laboratory of Oklahoma.**

As stated above, the City of Prague's March 1, 2019 $5,000.00 payment to DLO was necessary to keep the Hospital's lab services going. Plaintiffs are entitled to be compensated for this expenses from the Contempt Defendants.

**B. Damages Relating to Attorneys' Fees and Costs.**

The Contempt Order awarded Plaintiffs recovery of "those attorney's fees and costs specifically related to seeking enforcement of the TROs through civil contempt proceedings." See, Contempt Order, Doc. # 52, p. 10. To arrive at a reasonable attorney's fee award, district courts within the Tenth Circuit must calculate a "lodestar" amount by multiplying the hours plaintiffs' counsel reasonably spent on the litigation by a reasonable hourly rate." *Case v. Unified Sch. Dist. No. 233, Johnson Cty., Kan.*, 157 F.3d 1243, 1249 (10th Cir. 1998) (citing *Jane L. v. Bangerter*, 61 F.3d 1505, 1509 (10th Cir. 1995)). Services provided by non-lawyers such as law clerks and paralegals are reviewed in the same manner as lawyers' services. *Id*. A district court's award of attorney's fees will not be reversed on appeal unless it "represents an abuse of discretion." *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir.1986).

**A. Hours**

Plaintiffs relied on two law firms to litigate the underlying contempt motion, Stuart & Clover, P.C. ("S&C") and Christensen Law Group, PLLC ("CLG"). Both S&C and CLG attempted to keep their hours working on this issue to a minimum, and took care not to seek fees for duplicative work. (Vorndren Affidavit, **Exhibit 4**, ¶ 5-7; Tate Affidavit, **Exhibit 5**, ¶¶ 12-14) The contempt issue required the investment of a significant number of attorney and paralegal hours, which included investigation, client discussions and briefing, legal research, legal drafting, witness preparation, and related work. Tate Affidavit, **Exhibit 5**, ¶ 8)

Moreover, CLG delegated the work involved among partner level attorneys, senior associates, younger associates, and paralegals, in an effort to best contain costs and fees as much as possible given the circumstances. CLG also applied various reductions and "no charge" designations to several time entries in an exercise of the Firm's sound billing judgment. (Tate Affidavit, **Exhibit 5**, ¶¶ 11-14)

The hours spent on the contempt issues were reasonable in light of the dire circumstances under which the Hospital existed at the time, due to Defendants' willful failure to abide by Court Orders, and by Defendants' demand that Plaintiffs try the issue in a full evidentiary hearing. See, e.g., *Henson v. Columbus Bank & Trust Co.*, 770 F.2d 1566, 1575 (11th Cir. 1985) ("While [defendant] is entitled to contest vigorously '[plaintiffs'] claims, once it does so it cannot then complain that the fees award should be less than claimed because the case could have been tried with less resources and with fewer hours expended."). Prosecution of the contempt issue by Plaintiffs' counsel included, but was not limited to, preparing and participating in multiple telephone conferences with the Court; communicating with Plaintiffs and opposing counsel regarding the operational status of the Hospital; drafting pleadings seeking contempt sanctions; and preparing for the March 5, 2019 evidentiary hearing on the contempt matter, for which Plaintiffs' counsel prepared for the direct examination of nine witnesses, and prepared for the cross-examination of two witnesses counsel believed would appear for the Contempt Defendants. (Tate Affidavit, **Exhibit 5**, ¶ 8.)

In light of the above, Plaintiffs seek fees for the following time:

**<u>CLG Time</u>**: **<u>S&C Time</u>**:

| **Name** | **Total Hours** | | **Name** | **Total Hours** |
|---|---|---|---|---|
| J. Clay Christensen | 36.65 | | Joseph Vorndran | 11.8 |
| T. P. Howell | 1.80 | | | |
| Cori Loomis | 12.50 | | | |
| Jeffrey E. Tate | 41.15 | | | |
| Brock Z. Pittman | 48.15 | | | |
| Megan Paysnoe | 14.35 | | | |

(Vorndren Affidavit, **<u>Exhibit 4</u>**, ¶ 6; Tate Affidavit, **<u>Exhibit 5</u>**, ¶ 7) The time spent by CLG and S&C litigating the contempt issue was reasonable. (Vorndren Affidavit, **<u>Exhibit 4</u>**, ¶¶ 7-8; Tate Affidavit, **<u>Exhibit 5</u>**, ¶¶ 11-14; Rose Affidavit, **<u>Exhibit 6</u>**, ¶ 17, 21)

**B. Hourly Rates.**

The bench mark for setting a reasonable rate is whether the requested rate is in line with prevailing rates of other attorneys in the community for comparable services, by lawyers of reasonably comparable skill, experience, and reputation. *See, e.g., Lippoldt v. Cole*, 468 F.3d 1204, 1224-1225 (10th Cir. 2006). The rates requested for CLG are:

| **Name** | **Role / Year Admitted to Bar** | **Rate** |
|---|---|---|
| J. Clay Christensen | Managing Director / Admitted 1986 | $350/hr |
| T. P. Howell | Director / Admitted 1983 | $325/hr |
| Cori Loomis | Director / Admitted 1994 | $325/hr |
| Jeffrey E. Tate | Director / Admitted 1996 | $300/hr |
| Brock Z. Pittman | Associate / Admitted 2016 | $275/hr |
| Megan Paysnoe | Paralegal / NA | $170/hr |

(Tate Affidavit, **<u>Exhibit 5</u>**, ¶ 7)

Mr. Christensen's rate of $350 per hour is a reasonable rate. He is the Managing Director of CLG, has 33 years' experience, and is a seasoned court room litigator. (Tate Affidavit, **Exhibit 5**, ¶ 10; Rose Affidavit, **Exhibit 6**, ¶ 11) The $325 rate for Mr. Howell and Ms. Loomis, both Directors of CLG, are also reasonable. (Tate Affidavit, **Exhibit 5**, ¶ 10; Rose Affidavit, **Exhibit 6**, ¶¶ 12, 13). Mr. Howell has practiced commercial litigation for 36 years in state and federal court. Ms. Loomis has practiced for 25 years in the employment and healthcare sectors; her knowledge and expertise in these areas was instrumental in all facets of the litigation, including the contempt issues.

The $300 rate for Mr. Tate is reasonable as well. Mr. Tate, a Director of CLG, has practiced for 23 years in the areas of commercial and bankruptcy litigation. (Tate Affidavit, **Exhibit 5**, ¶ 10; Rose Affidavit, **Exhibit 6**, ¶ 14)

A rate of $275 per hour is reasonable for Mr. Pittman as a three year associate with significant experience in commercial litigation. He graduated *Cum Laude* from Oklahoma State University in 2013 with a B.S. in Finance. In 2016, he graduated with a Juris Doctorate degree with Distinction from the University of Oklahoma College of Law, where he earned the George J. Fagin Municipal Law Award for best municipal law paper on the subject of public finance, as well as the Thomas L. Hieronymus Memorial Scholarship. (Tate Affidavit, **Exhibit 5**, ¶ 10, 19; Rose Affidavit, **Exhibit 6**, ¶ 15)

Finally, the rate of $170 per hour is a reasonable rate for the paralegal time of Ms. Paysnoe. (Tate Affidavit, **Exhibit 5**, ¶ 10; Rose Affidavit, **Exhibit 6**, ¶ 16)

The hourly rates requested for the S&C attorneys and paralegals who performed work in the underlying contempt process are as follows:

| **Name** | **Role / Year Admitted to Bar** | **Rate** |
|---|---|---|
| Joseph Vorndren | Partner / Admitted 2006 | $175/hr |

(Vorndren Affidavit, **Exhibit 4**, ¶ 5) S&C has an ongoing contract with the City of Prague in which it reduces its rates to $170 per hour. Rates for each of the S&C attorneys are well below prevailing rates for attorneys of their age and experience and are, therefore, reasonable. (Vorndren Affidavit, **Exhibit 4**, ¶ 8; Rose Affidavit, **Exhibit 6**, ¶¶ 19-20)

**C. Total fee requested:**

The total lodestar attorneys' fee is $45,978.50 as set forth in the tables below:

| **CLG:** | **Total Hours** | **Hourly Rate** | **Total Fee** |
|---|---|---|---|
| J. Clay Christensen | 36.65 | $350.00 | $12,757.50 |
| T. P. Howell | 1.80 | $325.00 | $585.00 |
| Cori Loomis | 12.50 | $325.00 | $3,997.50 |
| Jeffrey E. Tate | 41.15 | $300.00 | $12,285.00 |
| Brock Z. Pittman | 48.15 | $275.00 | $12,677.50 |
| Megan Paysnoe | 14.35 | $170.00 | $1,611.00 |
| | | **Combined Total:** | $43,913.50 |

(Tate Affidavit, **Exhibit 5**, ¶ 7)

| **S&C** | **Total Hours** | **Hourly Rate** | **Total Fee** |
|---|---|---|---|
| Joseph Vorndran | 11.8 | $175.00 | $2,065.00 |

(Vorndren Affidavit, **Exhibit 4**, ¶ 6).

These were amounts actually incurred by Plaintiffs. (City Affidavit, **Exhibit 2**, ¶¶ 6-8) As shown above, they represent rates that are reasonable within the community, and they represent an amount of hours expended that are reasonable under the circumstances.

**C. EXPENSES.**

This court's Contempt Order also entitles Plaintiffs to recover costs incurred in prosecuting their motion for contempt. While Plaintiffs have not presented their various copy, long distance telephone charges for witness preparation, or other miscellaneous charges, the did incur process server charges totaling $395.00 to serve subpoenas related nine separate Subpoenas related to the March 5, 2019, Contempt Hearing. Service Invoices, **Exhibit 7**.

**D. REQUESTED RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court issue an Order finding Plaintiffs have suffered damages as set forth herein, and awarding them damages against the Contempt Defendants, jointly and severally, in each of the above requested amounts. Plaintiffs further request an award of any further attorneys'' fees and costs spent in obtaining damages for the contemptuous actions of the Contempt Defendants.

Christensen law Group, P.L.L.C.

By: /s/ Jeffrey E. Tate

J. Clay Christensen (OBA #11789)
T. P. Howell (OBA#10347)
Jeffrey E. Tate (OBA #17150)
Jonathan M. Miles (OBA #31152)
Brock Z. Pittman (OBA #32853)
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Telephone: (405) 232-2020
Facsimile: (405) 228-1113
clay@christensenlawgroup.com
lynn@christensenlawgroup.com
jeffrey@christensenlawgroup.com
jon@christensenlawgroup.com
brock@christensenlawgroup.com

- *and* –

Joseph M. Vorndran (OBA #21391)
Breanne M. Gordon (OBA #32508)
Stuart & Clover, PLLC
130 N. Broadway
Shawnee, OK 74801
Telephone: (405) 275-0700
Facsimile: (405) 275-6805
joe@stuartclover.com
breanne@stuartclover.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

This shall certify that on this 10th day of June, 2019, a true and correct copy of the above and foregoing was sent electronically to the Clerk of the Court using the CM/ECF System and transmittal of a Notice of Electronic Filing to the following counsel registered for ECF in this case:

Peter W. Brolick
Kristopher E. Koepsel
Riggs, Abney, Neal,
Turpen, Orbison & Lewis
502 West Sixth Street
Tulsa, OK 74119
pbrolick@riggsabney.com
kkoepsel@riggsabney.com

*-and-*

Frank M. Smith, Pro Hac Vice
FMS Lawyer, PL
9900 Stirling Road, Suite 226
Cooper City, FL33024
frank.smith@fmslawyer.com

*Attorneys for Rural Community Hospitals of America, LLC*

James M. Reed
John T. Richer
Carson K. Glass
Hall, Estill, Hardwick, Gable,
Golden, & Nelson P.C.
320 South Boston Avenue, Suite 200
Tulsa, OK 74103
jreed@hallestill.com
jricher@hallestill.com
cglass@hallestill.com

*Attorneys for WCS Corporation, Inc.*

/s/ Jeffrey E. Tate
Jeffrey E. Tate